456 F.Supp.2d 508 (2006)
In Re WORLDCOM, INC. SCURITIES LITIGATION,
This document relates to:
William K. Holmes, Holmes Capital, LLC, Brew Dog, LLC, Bimini Star, LLC, and EBH Investments Co., LLC, Plaintiffs,
v.
Jack Grubman, and Citigroup Global Market Inc. f/k/a Smith Barney & Co., Inc., Defendants.
Nos. 02 Civ. 3288(DLC), 04 Civ. 8308(DLC).
United States District Court, S.D. New York.
October 13, 2006.
*509 *510 David L. McGee, Peter J. Mougey, Jack W. Lurton, III, Beggs & Lane, LLP, Pensacola, FL, Joseph J. Burton, Jr., Burton & Armstrong, LLP, Atlanta, GA, for Plaintiffs William K. Holmes, Holmes Capital, LLC, Brew Dog, LLC, Bimini Star, LLC, and EBH Investments Co., LLC.
Martin London, Richard Rosen, Brad S. Karp, Walter Rieman, Joyce S. Huang, Paul Weiss Rifkind Wharton and Garrison LLP, and Peter Vigeland, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, for Defendants Jack Grubman and Citigroup Global Markets Inc., f/k/a Smith Barney & Co., Inc.

OPINION AND ORDER
COTE, District Judge.
This Opinion addresses a motion to dismiss the third amended complaint filed in an Individual Action brought within the context of the WorldCom Securities Litigation,[1] a motion to enlarge permission to amend, and a motion to remand the case to the bankruptcy court in Georgia. For the following reasons, the motion to dismiss is granted, the motion to enlarge is denied in part, and the motion to remand is denied.

Background
William K. Holmes and entities which he controls ("Holmes") filed this action in June 2003 in the United States Bankruptcy Court for the Middle District of Georgia. The case was transferred to this Court and consolidated for pre-trial purposes with the Securities Litigation.[2] On March 24, 2006, the motion to dismiss the second amended complaint in the Holmes *511 action was granted. In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288(DLC), 2006 WL 751382 (S.D.N.Y. Mar.24, 2006)("March 2006 Opinion"). That pleading attempted to state "holder" claims. Specifically, Holmes sought recovery under Georgia law based on his assertion that his broker convinced him not to sell 2.1 million shares of WorldCom stock that he owned by referring to the defendants' June 25, 1999 research report concerning WorldCom.
Holmes did not request an opportunity to amend, but the Court sua sponte gave the plaintiff a limited opportunity to amend since the complaint referred as well to a purchase of an unidentified number of WorldCom shares after June 25, 1999. Among other things, Holmes was required in any amended pleading to identify with specificity purchases of WorldCom stock after June 25, 1999, the provision of the Georgia statute on which he was relying to assert his statutory claim, and the provision of any contract which he asserted the defendants had breached.
Holmes' third amended complaint lists purchases of WorldCom securities after April 9, 1998. As for purchases after June 25, 1999, Holmes identifies purchases of stock on ten separate days up to July 20, 2000, and purchases of call options up to September 2000. All of his investments in WorldCom securities were involuntarily sold by September 2000 to pay margin calls.
In this most recent pleading, Holmes asserts that the defendants Jack B. Grubman and Citigroup Global Market Inc. f/k/a Smith Barney & Co., Inc. ("Citigroup Defendants") made negligent and fraudulent misrepresentations that induced him to purchase WorldCom securities. Grubman was the telecommunications analyst at Smith Barney, where Holmes had a brokerage account. Holmes asserts that the defendants operated under a conflict of interest from April 1998, providing underwriting services to WorldCom at the same time as they were recommending to investors that they purchase WorldCom securities. Holmes asserts further that the defendants made recommendations to investors to buy WorldCom stock when they knew that an honest assessment of WorldCom would yield a conservative target price for WorldCom stock, but that that honest assessment would also result in the defendants' loss of investment banking fees.
According to Holmes, from June 25, 1999 onwards, the defendants were blindly bullish towards WorldCom, as its stock fell in price from $92 per share to roughly $25 per share in October 2000. In early 2000, Grubman changed his valuation method to permit him to continue to support the target price for WorldCom stock in the face of WorldCom's shrinking revenue stream. Grubman abandoned a discounted free cash flow valuation methodology, a methodology which is affected by consideration of a company's capital expenditures.
During this period, Holmes was in almost daily contact with his financial advisor Charles M. Parker, who provided him with the defendants' research reports. Both Parker and Holmes relied on those research reports in their discussions of WorldCom, and Holmes relied on them in making his decision to purchase World-Corn securities. Holmes lists fourteen recommendations by the defendants to investors to buy WorldCom stock between June 25, 1999 and October 2000.
The third amended complaint pleads six causes of action. The first is asserted against both defendants; the remaining are asserted solely against Smith Barney. The first cause of action is for fraudulent misrepresentation and omissions of WorldCom's true financial condition and the defendants' *512 conflict of interest. The second pleads a breach of fiduciary duty. The third and fourth assert negligent misrepresentation for misleading information and omissions, and negligence in making disclosures. The fifth cause of action asserts a violation of Title 10, Chapter 5, Section 12 of the Official Code of Georgia. The final claim is for breach of contract.[3]
Meanwhile, on February 1, 2006, Holmes requested that his action be remanded to the Georgia bankruptcy court. That motion was fully submitted on March 2, just weeks before his second, amended pleading was dismissed in its entirety. That motion would have been denied on the merits, but in any event was rendered moot by the dismissal and has not been renewed.
Discussion
A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2), Fed.R.Civ.P. The purpose of this requirement is to give fair notice of a claim and the grounds upon which it rests so that the opposing party may identify the nature of the case, respond to the complaint, and prepare for trial. Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Rule 8 is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is "not meant to impose a great burden upon a plaintiff." Dura Pharms. Inc. v. Broudo, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). "The complaint thus need not set out in detail the facts upon which the claim is based." Twombly v. Bell Atlantic Corp., 425 F.3d 99, 107 (2d Cir.2005) (citation omitted). If it is clear, however, that "no relief could be granted under any sets of facts that could be proved consistent with the allegations," the claim should be dismissed. Swierkiewicz, 534 U.S. at 514, 122 S.Ct. 992. In construing the complaint, the court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir.1997).
"The Rules do establish more demanding pleading requirements for certain kinds of claims." Twombly, 425 F.3d at 107. These claims, including fraud, must "be stated with particularity." Rule 9(b), Fed.R.Civ.P. To comply with the requirements of Rule 9(b), an allegation of fraud must specify: "(1) those statements the plaintiff thinks were fraudulent, (2) the speaker, (3) where and when they were made, and (4) why plaintiff believes the statements to be fraudulent." Koehler v. Bank of Bermuda (New York) Ltd., 209 F.3d 130, 136 (2d Cir.2000).
1. Pre-June 25, 1999 Purchases
The defendants move to dismiss all claims to the extent that they are based on purchases before June 25, 1999. Holmes had never referred to any claims based on such purchases in his prior pleadings and motion practice, and as a result, leave to amend was confined to claims based on purchases of WorldCom stock after June 25, 1999. Indeed, in his prior pleadings Holmes' claims hinged on his asserted reliance on a June 25, 1999 telephone conversation. Based on that call, Holmes alleged that he decided to not sell the 2.1 million shares of WorldCom stock that he owned, deciding to hold that stock and acquire an unidentified amount of additional shares *513 after June 25. Based on that cryptic reference to purchases made in reliance on the defendants' representations, Holmes was granted a limited leave to amend his complaint for a fourth time.[4]
Relying on the standard for amendment that applies under Rule 15, Fed.R.Civ.P., Holmes moved on June 9 to enlarge the ruling in the March 2006 Opinion to permit him to plead claims based on purchases of WorldCom stock and options prior to June 25, 1999. This motion is an untimely motion for reconsideration of the March 2006 Opinion, and may be denied on that ground alone. S.D.N.Y.R. 6.3. See also, Lichtenberg v. Besicorp Group Inc., 204 F.3d 397, 402 (2d Cir.2000) (finding motion for reconsideration of injunction under S.D.N.Y. Local Rule 6.3 untimely when filed after more than ten days of entry of injunction).
In addition, the standard for amendment that applies to Holmes' Third Amended Complaint is good cause, since the amendment is governed by a scheduling order. See Rule 16, Fed.R.Civ.P.; Grochowski v. Phoenix Const., 318 F.3d 80, 86 (2d Cir. 2003); Parker v. Colum. Pictures Indus., 204 F.3d 326, 340 (2d Cir.2000); In Re Wireless Serv. Antitrust Litig., No. 02 Civ. 2637(DLC), 2004 WL 2244502, at *5 (S.D.N.Y. Oct.6, 2004). Holmes has not shown good cause to add claims based on purchases before June 25, 1999.
Pursuant to the Order of Consolidation in the Securities Litigation, Holmes had twenty-one days following the arrival of his case on, this Court's docket to file an amended complaint. Shortly after that period expired, Holmes moved to amend, and permission was granted. March 2006 Opinion, at *1. Holmes captioned that amended pleading as the Second Amended Complaint. By that time, Holmes was fully on notice that holder claims were not cognizable under Georgia law. In re WorldCom, Inc. Sec. Litig., 336 F.Supp.2d 310, 322-23 (S.D.N.Y. Sept.17, 2004). Despite that notice, Holmes persisted in restating his holder claims on December 2, 2004, and made only oblique reference to some kind of claim for purchases of WorldCom stock after June 25, 1999. Having failed to show diligence or good cause, the claims based on purchases before June 25, 1999, are stricken.[5]
2. Post-June 25, 1999 Options Purchases
The Citigroup Defendants also move to strike any claim for damages based on the purchase of options after June 25, 1999, as beyond the scope of amendment permitted by the March 2006 Opinion. They do not contend, however, that the Opinion precludes Holmes from seeking damages based on shares acquired after June 25, 1999, either by exercising options or by using the proceeds of derivative transactions to make the purchases. They do assert that the March 2006 Opinion may not properly be read to give Holmes an opportunity to amend to add claims based on securities purchases other than the purchases of WorldCom stock after June 25, 1999.
While a strict reading of the March 2006 Opinion supports the defendants' view, the Opinion did not focus on the nature of the securities purchased after June 25, 1999. Therefore, to the extent Holmes can state a cause of action for purchases of WorldCom *514 options after June 25, 1999, he may include a claim for damages based on that trading.
3. Fraud, Negligence, Negligent Misrepresentation
The Citigroup Defendants move to dismiss the claims for fraud, negligence, and negligent misrepresentation[6] on the grounds that Holmes has failed to plead facts that give fair notice of 1) his theory of proximate causation; 2) any statement by the defendants that could support a claim of reliance; and 3) any actionable statements of fact by the defendants (as opposed to opinion). It is only necessary to address the first of these arguments.
Proximate causation is an element of a claim of fraud under Georgia law. Taylor v. Bennett Chevrolet/Buick, Inc., 271 Ga.App. 300, 609 S.E.2d 215, 217 (2005). Similarly, proximate causation is one of the elements of a claim of negligence under Georgia law. Cieplinski v. Caldwell Elec. Contractors, 280 Ga.App. 267, 633 S.E.2d 646, 650 (2006); Newitt v. First Union National Bank, 270 Ga.App. 538, 607 S.E.2d 188, 196 (2004) (setting forth the elements for a negligent misrepresentation claim). In a negligence action, a plaintiff must show that she "sustained economic injury proximately resulting from" reliance on the false information. Newitt, 607 S.E.2d at 196. Proximate cause requires proof that "but for" the wrongful act the injury would not have occurred, and proof that the injury "can be traced directly" to the wrongful act. Glisson v. Freeman, 243 Ga.App. 92, 532 S.E.2d 442, 455 (2000). Proximate cause is "the efficient cause" of the injury, and "there may be more than one proximate cause." Id. A cause that is "merely incidental is not the proximate and responsible" cause of injury. Eldred v. Blue Cross & Blue Shield of Ga., 274 Ga.App. 798, 619 S.E.2d 331, 333 (2005).
The common law doctrine of proximate causation is well established in American tort law. Proximate cause is the doctrine which limits a defendant's responsibility for the consequence of his acts. Holmes v. SIPC, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). It demands some direct relation between the injury which is asserted and the wrongful conduct of the defendant. Id. There have been many rationales for requiring proof of proximate cause in tort claims, including the fact that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiffs damages attributable to the violation as distinct from other, independent factors." Anza v. Ideal Steel Supply Corp., ___ U.S. ___, ___, 126 S.Ct. 1991, 1997, 164 L.Ed.2d 720 (2006). Without the concept of proximate causation, courts would be forced "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury" from the wrongdoing. Holmes, 503 U.S. at 269, 112 S.Ct. 1311. Requiring proof of proximate causation in tort litigation removes these burdens while allowing suits to proceed by those who are more directly injured. Anza, 126 S.Ct. at 1998.
Applying the principle of proximate causation to tort claims based on misrepresentations or omissions concerning securities requires an assertion that the truth concealed by the defendant entered the market place. With such an assertion, a trading loss can be said to have been proximately caused by a prior misrepresentation. *515 See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In the absence of a disclosure, the misrepresentation has simply permitted the stock to trade at an inflated price. Until the concealed information is disclosed, a drop in price may reflect any number of things, but it will not reflect the impact of the misrepresentation or omission on the stock price. Id. at 343, 125 S.Ct. 1627.
These principles are widely recognized preconditions for tort recovery. For example, as explained in the Second Restatement of Torts, "[n]ot all losses that in fact result from the reliance are, however, legally caused by the representation. In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates." Restatement (Second) of Torts § 548A cmt. a & b (1977). The Restatement considers a demonstration of proximate causation essential for finding liability in the case of misrepresentations or omissions concerning securities.
[O]ne who misrepresents the financial condition of a corporation in order to sell its stock will become liable to a purchaser who relies upon the misinformation for the loss that he sustains when the facts as to the, finances of the corporation become generally known and as a result the value of the shares is depreciated on the market, because that is the obviously foreseeable result of the facts misrepresented. On the other hand, there is no liability when the value of the stock goes down after the sale, not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition.
Id. (emphasis added). Similarly, the leading treatise on tort law explains that recovery of consequential damages, such as the loss in the value of securities, requires proof that the "consequential . . . damages" were "proximately caused by the fraudulent conduct." Prosser and Keeton, The Law of Torts, § 110 (W. Page Keeton ed., 5th ed.1984). Recovery is restricted "to those losses which might be expected to follow from the fraud and from events that are reasonably foreseeable." Id. Losses caused by factors unrelated to the misrepresentation are not proximately caused by it and are not recoverable.
[I]f the false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors in no way relate [sic] to the representations will not afford any basis for recovery. It is only where the fact misstated was of a nature calculated to bring about such a result that damages for it can be recovered.
Id. There is no reason to believe that the Georgia common law embodies any different standard. In pleading a cause of action in tort under Georgia law, a plaintiff must plead that the damages for which he seeks recovery were "proximately caused by the breach." Tante v. Herring, 264 Ga. 694, 453 S.E.2d 686, 687 (1994) (citing Prosser & Keaton, The Law of Torts, § 30).
Holmes has not pleaded proximate causation. He has not given fair notice of any disclosure that could be said to have played a role in the decline in WorldCom's stock price and that was concealed by the defendants' fraud or negligence.[7]
*516 Holmes contends that it is enough for him simply to have pleaded that "but for" for defendants' statements he would not have purchased the WorldCom securities. He contends that it is "of no avail" to defendants that his losses may have been due to "market decline." He is wrong. Factual injury is not proximate causation. Holmes, 503 U.S. at 266 & n. 11, 112 S.Ct. 1311. See Tante, 453 S.E.2d at 687 (implicitly rejecting but for standard).
Holmes argues that he need not identify any linkage between the defendants' statements and his loss since adopting that rule of proximate causation "would allow brokerage firms to lie to their clients with impunity about the nature of the investments they recommend and never face liability."[8] Not so. To the extent that a plaintiff is able to plead that the loss she suffered is attributable to the disclosure of information linked to the broker's lies about the nature of the investments, then she may state (and recover on) a claim against the brokerage firm. Without that linkage, however, the "lies" cannot be said to have been the proximate cause of any injury to the client. "[D]amage proximately caused by the breach" of a duty to a plaintiff is a necessary part of the "traditional formula for elements necessary to a cause of action in tort." Tante, 453 S.E.2d at 687.
Finally, Holmes relies on In re Parmalat Sec. Litig., 375 F.Supp.2d 278 (S.D.N.Y.2005), for the proposition that a corrective disclosure is not necessary where the subject of the misrepresentations caused the loss. Parmalat provides no comfort to Holmes. The fraud at issue in Parmalat concealed the extent of the company's debt. The risk associated with that concealment materialized when the company suffered a liquidity crisis and its shares lost almost one-half of their value. Id. at 306-307. Holmes has not identified any materialization of any risk concealed or misrepresented by the defendants that could be said to have proximately caused his alleged losses.
*517 In sum, Holmes' Third Amended Complaint proceeds under a theory that the defendants concealed the extent of their conflicted relationship with WorldCom and WorldCom's "true financial strength", and that that conflict caused them to recommend that the public generally and customers of Smith Barney in particular, including Holmes, purchase WorldCom securities. Holmes' claims for fraud, negligence, and negligent misrepresentation each require that he plead that any injury he sustained from purchasing WorldCom securities between June 25, 1999 and October 2000 was proximately caused by that fraud or negligence. Because he has not given the defendants fair notice of his theory of proximate causation, that is, how any risk concealed by the defendants materialized before his portfolio was involuntarily sold, these claims must be dismissed.
4. Fiduciary Duty
The Citigroup Defendants move to dismiss the claim for breach of fiduciary duty because Holmes has not alleged the existence of a fiduciary duty under Georgia law. Holmes did not have a discretionary account with Smith Barney, and relies on his contention that a fiduciary duty nonetheless existed because he had a relationship of "mutual confidence" with his broker.
The existence of a fiduciary relationship is governed by statute in Georgia. Bowen v. Hunter, Maclean, Exley & Dunn, 241 Ga.App. 204, 525 S.E.2d 744, 748 (1999). The statute provides:
Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.
Ga.Code Ann. § 23-2-58 (emphasis supplied). Simply placing "great trust and confidence" in another will not create a confidential relationship. Walsh v. Campbell, 130 Ga.App. 194, 202 S.E.2d 657, 662 (1973). See also In re Tri-State Crematory Litig., 215 F.R.D. 660, 683 (N.D.Ga. Mar.17, 2003); Newitt, 270 Ga.App. at 546, 607 S.E.2d 188 ("In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone."); Bowen, 241 Ga.App. at 208, 525 S.E.2d 744 (a person who is "a close personal, confidential, and business adviser" is not a fiduciary). Instead, the fiduciary must be "so situated as to exercise a controlling influence over" the plaintiff. Bowen, 241 Ga.App. at 208, 525 S.E.2d 744 (citation omitted). See also Tigner v. Shearson-Lehman Hutton, Inc., 201 Ga. App. 713, 411 S.E.2d 800 (1991)(finding a confidential relationship where a broker exercised a "controlling influence" over an account holder due to the latter's mental disabilities). In Georgia, a broker only becomes a "full-fledged fiduciary" of his client where the client has entrusted the broker with control over a discretionary trading account. Prudential Bache Sec., Inc. v. Pitman, No. 1:89 Civ. 85(JTC), 1991 WL 160039, *4 (N.D.Ga. Apr.4, 1991); Glisson, 532 S.E.2d at 449 (Ga.Ct.App. 2000) ("with respect to a nondiscretionary account . . . the broker owes . . . the duty to transact business only after receiving prior authorization from the client and the duty not to misrepresent any fact material to the transaction.")
Holmes contends that Georgia law allows clients with non-discretionary accounts to assert a claim for a breach of *518 fiduciary duty, at least where the relationship is one of "mutual confidence." Business dealings are generally accompanied by trust and confidence, but that is insufficient under Georgia law to create a fiduciary relationship. Newitt, 270 Ga.App. at 546, 607 S.E.2d 188 (2004). Holmes' claim for, breach of a fiduciary duty fails as a matter of law.
5. Georgia Securities Statute
The Citigroup Defendants move to dismiss Holmes' claim based on a violation of the Georgia Securities Act of 1973 because Holmes has not identified the provision of the statute on which he relies, as required by the March 2006 Opinion. The March 2006 Opinion required Holmes to identify "the specific provision" of the statute on which his suit was based. March 2006 Opinion, at *3.
Holmes has pleaded a violation of "Title 10 Chapter 5 Section 12" and demands judgment pursuant to "Section 14" of the statute. Section 12 alone contains twenty-three different prohibitions, as well as the single section which creates all substantive violations under the Georgia Blue Sky law. His pleading tracks provisions of the statute regulating offers of securities, the activities of investment advisors, securities dealers, and broker-dealers.
Holmes has not pleaded a violation of a specific section of the Georgia securities statute and has thereby obstructed any analysis of whether his pleading states a claim. His request for an additional opportunity to amend is denied. He was specifically warned that he would be given no further opportunity to amend. The defendants have already briefed three motions to dismiss in this litigation. They will not be put to the burden of a further round of briefing.
6. Breach of Contract
The Citigroup Defendants move to dismiss the breach of contract claim for its failure to identify the provisions of the contract on which it is based, as required by the March 2006 Opinion. Holmes alleges in his breach of contract claim that he entered into customer agreements that required that all transactions "shall be subject to any applicable constitution, rules, regulations, customs and usages of the exchange or market and its clearinghouse. . . ." The customer agreements also provided that Smith Barney could make customer loans and margin loans. Holmes asserts that Smith Barney promoted such loans and "improperly advanced substantial funds" to Holmes pursuant to the customer agreements and loan documents. The loans were "not suitable" for Holmes "in that they induced [him] to borrow money based on inflated stock prices and exaggerated and inappropriate loan amounts." Holmes concludes that Smith Barney denied him "the benefit of [the] bargain" in the customer agreements, violated its internal guidelines and regulations, allowed excessive, unauthorized margin loans based on inflated stock values, and breached duties of good faith and fair dealing.
Holmes has attached eighteen pages of account documents to his complaint. The first is a new account statement in which Holmes estimated his annual income at $600,000, and his net worth as $25 million. He identified his investment objectives as growth, and risk tolerance as aggressive and allowing for speculation. He indicated that he had previously invested in options and was aware of the risks associated with options. In other attached documents, Holmes shared his tax identification number, authorized automatic funds transfers, guaranteed the account to which Smith Barney extended credit, and represented *519 that he was authorized to represent his account.
Holmes contends in his opposition to the motion to dismiss the breach of contract claim that he is seeking to enforce "the `guts' and `substance'" of the customer agreements, which impose the duty on the broker to comply with law, and which imply a duty of good faith and fair dealing. In particular, he explains that this claim rests on his assertion that Smith Barney improperly advanced margin loans that were not suitable for Holmes and were based on a stock price that was inflated by the defendants' fraudulent misrepresentations and omissions. He contends in his opposition that Smith Barney, instead of acting "as a true `broker/dealer,'" sold the stock in a series of involuntary transactions to protect itself instead of Holmes.
To the extent that Holmes is contending that' Smith Barney violated any law or regulation, then he was obligated to identify the law and bring a claim pursuant to it, assuming it created a private right of action. To the " extent that he is attempting to plead a breach of the duty of good faith and fair dealing, then under New York law, which he admits applies to this claim, he is required to plead as well a viable claim for breach of contract. Without an adequate pleading of a breach of a term of contract, plaintiffs may not plead a breach of the implied duty of good faith and fair dealing. ARI & Co., Inc. v. Regent Ina Corp., 273 F.Supp.2d 518, 523-24 (S.D.N.Y. Jul.24, 2003); EBC I, Inc. v. Goldman Sachs & Sachs & Co, 5 N.Y.3d 11, 22, 799 N.Y.S.2d 170, 832 N.E.2d 26 (2005); Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 697 N.Y.S.2d 128 (1999).
Although Holmes argues that his claim rests on Smith Barney's breach of duties in connection with his margin account, he has not identified any contractual provision concerning his margin account that was breached, either in permitting Holmes to establish a margin account or in liquidating his investment accounts to meet margin calls. Because Holmes has not identified a specific contractual provision governing his relationship with Smith Barney that was allegedly breached by the defendant, this claim must be dismissed as well.
In sum, Holmes has failed to plead any violation of statutory or common law against either defendant. Holmes' initial iterations of his complaint relied solely on assertions that he had been injured when he held his stock instead of selling it, on reliance on the defendants' statements on June 25, 1999. Although he had not requested an opportunity to amend, the Court granted him a single opportunity to state, claims based on purchases of WorldCom stock after June 25, 1999. It is now clear why Holmes did not begin by pleading claims based on such purchases. All of his WorldCom holdings were sold, involuntarily, by the Fall of 2000, that is, long before any disclosure of an accounting fraud at WorldCom or any disclosure of wrongdoing by the defendants that could be alleged to have contributed to the decline in the price of WorldCom securities. He has therefore been unable to plead not just holder claims but also claims based on his purchases of WorldCom securities.
Conclusion
The motion to dismiss Holmes' third amended complaint is granted. The motion to enlarge is granted in part. The motion for remand is denied. The Clerk of Court shall close the case.
SO ORDERED:
NOTES
[1] The history of both WorldCom's collapse and the resulting litigation has been described in many prior opinions by this Court. See, e.g., In re WorldCom, Inc. Sec. Litig., 02 Civ. 3288(DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) (approval of consolidated class action settlement with Citigroup defendants); In re WorldCom, Inc. Sec. Litig., 346 F.Supp.2d 628 (S.D.N.Y.2004) (addressing Underwriter Defendants' motion for summary judgment); In re WorldCom, Inc. Sec. Litig., 294 F.Supp.2d 392 (S.D.N.Y.2003) (deciding a number of defendants' motions to dismiss class action, including the motion of Citigroup, Inc., Salomon Smith Barney and Jack Grubman).
[2] The terms and reference in this Opinion are those customarily used in Opinions in the WorldCom Securities Litigation. See, e.g., In re WorldCom, Inc. Sec. Litig., 2004 WL 2591402; In re WorldCom, Inc. Sec. Litig., 294 F.Supp.2d 392.
[3] In a seventh claim, Holmes reasserts the dismissed "holder" claim in order to preserve the theory for appellate review.
[4] The defendants contend that this is in fact Holmes' fifth amendment.
[5] It should be noted that Holmes did not file a reply brief in support of his motion to enlarge, and has not otherwise tried to excuse the untimely filing of his de facto motion for reconsideration or to explain how he meets the Rule 16 requirement that he show diligence.
[6] Holmes claims for negligence and negligent misrepresentation may be treated as a single claim. BDO Seidman, LLP v. Mind is Acquisition Corp., 276 Ga. 311, 578 S.E.2d 400, 401 (2003)(noting that negligent misrepresentation claims sound in negligence).
[7] Holmes' omission in this regard is not surprising. The WorldCom Securities Litigation has proceeded largely on the theory that WorldCom engaged in a massive accounting fraud. That fraud did not begin to come to light until early 2002, long after Holmes' entire portfolio in WorldCom securities had been liquidated to meet margin calls. See In re WorldCom, Inc. Sec. Litig., 388 F.Supp.2d 319, 346 (S.D.N.Y. Sept.21, 2005) (the earliest identified partial disclosure of fraud was January 29, 2002). To the extent that the Citigroup Defendants' conflict of interest in touting WorldCom has been pleaded in the Securities Litigation, it has been as an adjunct to the allegations about the accounting fraud, and to assertions that Grubman was actually aware that WorldCom was misrepresenting its financial condition to the public. See, e.g., In re WorldCom, 294 F.Supp.2d at 404-05, 424-26. Even if it were possible to plead a negligence or fraud claim based on the conflict of interest theory alone, Holmes has not pointed to any public disclosure of the conflict that could be said to have contributed to the drop in the price of WorldCom's securities between June 1999 and October 2000, the month in which his portfolio was involuntarily liquidated.
[8] In resisting this motion to dismiss, Holmes at times characterizes his pleading as presenting the theory that the defendants concealed that the revenues they forecasted for WorldCom were "not coming to fruition", and that Grubman manipulated his methodology "to conceal the declining forecasted revenue." In his pleading, Holmes has intentionally kept his theory of liability vague. To the extent that these statements in his memorandum refer to the fact that WorldCom's revenue or stock price was not meeting publicly predicted target prices, that was an entirely public matter, and not a fact that was or could have been concealed or misrepresented by either defendant. To the extent that this is intended as a reference to WorldCom's unreported, internal financial condition, Holmes has not rested his Third Amended Complaint on an allegation that WorldCom was engaged in accounting irregularities during the time of his investment or identified any public disclosure of WorldCom's internal financial condition during his investment that was concealed by the defendants.